# COURT OF APPEALS.

## The Chenango Bridge Company, appellants agt. The Binghamton Bridge Company, respondents.

In this case the opinion of the *court*, by Judge Wright, preceded by the opinion of Judge Smith, taking the same views, written in 1862, when the court were equally divided on the case, is published *ante page* 124. We now publish the opinion of Judge Denio, written in 1862, taking an adverse view of the case, and also the dissenting opinion of Judge Emott, written at the time of Judge Wright's, in 1863, taking substantially the same grounds with Judge Denio. A little reflection will show the vast importance of the questions involved in this case, especially when it is considered that the legislature, at each successive session, throw off in great profusion franchises to corporations and associations, without much apparent reflection upon the binding force they involve upon the *state* as well as upon those accepting the franchises.

Judge Denio holds, in this case, upon the principal question, that the state, through the law-making power, contracted with the bridge company that if it would build and maintain the bridges in question, the law would not permit any other person to put up a bridge over the stream within two miles either way from such bridges. The chartering of another company, with authority to construct a bridge within that distance, was a *plain violation of the bargain*, and as it was a contract within the protection of the constitution of the United States, the *second charter was null and void*.

Judge Emott holds that the 31st section of the act of 1805 confers upon the plaintiffs *two distinct privileges*; one, that it should not be lawful for any person to have any other bridge or ferry within a certain distance of that authorized by the act; and the other, that it should not be lawful for any person to pass the bridge of the corporation *without paying toll*. These privileges are given in the same terms and in immediate succession. Both these grants must receive a similar construction. If the *interpretation applied by the defendants* to that part of the section forbidding the establishment of another bridge or ferry, be correct, the residue, which confers upon the plaintiffs the right and the power to exact tolls for the use of their bridge, must be construed in a similar manner. If the legislature are not forbidden by the clause now in question from authorizing the construction of another bridge within the limit of two miles, they are equally at liberty to authorize any person to pass the plaintiffs' bridge without the payment of tolls. This would leave the most vital and valuable part of the plaintiffs' franchise, notwithstanding the impealability of the statute conferring it, wholly at the mercy of subsequent legislatures. It is a consequence which would hardly be contended for by any lawyer, and yet it is difficult to see how it could be escaped, if the principles of construction for which the defendants contend are to be adopted.

It seems clear that where the legislature agree that an act *shall not be lawful*, or *be done*, they agree that they will not do it, or make it lawful or permissible for others to do it.

DENIO, Ch. J. (*dissenting*). The supreme court determined the case against the plaintiffs on the sole ground that there was no prohibition contained in the legislative enactments which constitute the plaintiffs' charter, against the erection of other bridges over the same stream and in the vicinity of their bridge. But that court was of the opinion, both at the special and the general term, that if the restriction contained in the charter of the Delaware Bridge Company had been incorporated into the plaintiffs' charter, it would have constituted a contract between the state and the corporators which would have been within the protection of the provisions of the constitution of the United States, which forbids the passage of any law by a state impairing the obligation of contracts; and the learned justice, who determined the case at the special term, has prepared an extended statement of the reasons for that opinion, in which I understand the general term substan-tially to concur.

We have recently had occasion to examine the same point in another case, where, although the case was decided on other grounds, we came to the conclusion that the legislature might, for the benefit of the corporators, annex to a grant, a corporate franchise, a restriction upon legislative power over a particular subject, which would bind the state, and all claiming under it, as constituting one of the terms of a contract which could not consistently with the federal constitution be impaired as to its obligatory effect by subsequent legislation. (*In the matter of Oliver Lee & Co.'s Bank*, 21 *N. Y.* 9.) In this class of cases, which involve questions arising under the constitution of the United States, we receive the matured judgments of the supreme court of the union as authentic evidence of the law, because it is the tribunal which the constitution itself has appointed to decide such questions; and our judgments are subject to review there, and to be reversed if they shall fail to conform to the law as there laid down.

In a series of decisions, commencing with *Fletcher* agt. *Peck* (6 *Cranch*, 87), embracing *Dartmouth Coll.* agt. *Woodward* (4 *Wheat*. 518), and several other intermediate ones, and coming down to the modern cases of *The State Bank of Ohio* agt. *Knoop* (16 *How.* 369), and *Dodge* agt. *Woolsey* (18 *id.* 331), the doctrine is finally settled that a grant or other executed conveyance is a contract in the sense of the constitution; that grants and conveyances, made by means of statutes passed by the state legislatures, are equally within the constitution as private grants between individuals, and that a state may, by means of a grant effected by a public statute, impose restraints upon the law-making power; which restraints it is not within its competency to abrogate by a subsequent statute. The cases referred to, from *Howard's Reports*, are striking examples of restrictions upon the power of taxation, over particular subjects, effected by statutes granting corporate franchises, but which, as it was held, the state could not by any subsequent act of legislation remove. (*See, also, The Ohio Life & Trust Co.* agt. *Debolts*, 16 *How.* 477, *per* TANEY, *C. J.*) The force of this course of decision is not at all weakened by the judgment in the case of *The Charles River Bridge* agt. *The Warren Bridge* (11 *Peters*, 420), in which, though it was held that the exclusive right claimed by the plaintiffs could not be sustained, the decision was placed wholly upon the ground that the plaintiffs' charter did not, by its terms, or by any allowable implication, forbid the legislature from authorizing the establishment of another bridge. The opinion of the court, pronounced by Mr. Chief Justice TANEY, proceeds throughout on the assumption that the legislature of Massachusetts was competent to bind itself to an engagement against the erection of another toll bridge, and insists only that, in the case before it, it had not done so. The case may contain doctrines in respect to the construction of statutes applicable to the present case, but it plainly concedes that where, in the

charter of a bridge company, there is an explicit prohibition against establishing another bridge, it is binding upon the state, and the obligation cannot be renounced by succeeding legislatures. The doctrine has recently been reasserted in the supreme judicial court of Massachusetts, in the case in which the charter of an early railroad company contained a provision that no other railroad than the one thereby granted should, within thirty years after the passage of the act, be authorized to be made upon the same route. Charters were subsequently granted by the legislature to several railroad corporations, which, together, authorized a line of railroad nearly corresponding with the plaintiffs' road. The court, after hearing an elaborate argument, and by a carefully prepared opinion by the late Chief Justice SHAW, decided in favor of the plaintiffs' claim to an exclusive right, and gave judgment for an injunction against operating the defendants' roads.

The most serious question, therefore, in the present case, is whether the prohibition against constructing other bridges within a distance of two miles *is a part of the charter* of the Chenango Bridge Company.

It will be seen that the act of 1805, provides for the incorporation of two separate bridge companies, one of which was to be called The President & Directors of the Delaware Bridge Company, and to have for its object the erection of a bridge across each of the two branches of the Delaware river, where the turnpike road passed over them; and the other to be called "The Susquehannah Bridge Company," for the construction of two other bridges, to be laid across the Susquehannah and the Chenango rivers respectively, at points indicated. The series of provisions respecting these companies, is introduced by a very significant *preamble.* It sets forth an *urgent* public necessity for these bridges, by declaring in effect that the motives which led to the incorporation of the turnpike roads, provided for in the same act, cannot be carried into full effect, or

the public convenience promoted without the bridges. It then sets out the necessity which is thought to exist of extending extraordinary encouragement to the enterprise, on account of the difficulty of the work, its exposure to injury from sudden freshets, and the probability that "a frequent renewal of the whole capital," will be required to secure permanent and durable bridges. This recital is introductory of and applies equally to the subsequent provisions respecting each of the bridge companies, and is therefore as applicable, so far as appears, to the bridge over the Chenango, as to either of the others. Its object is to explain the reason for offering the peculiar inducements which are held out to encourage parties to undertake the several enterprises, in order that those who might in future years be called upon to expound the act may understand the motives which led to its enactment. These inducements consist in the rates of toll allowed to be taken, the duration of the charters, and especially, as it seems to all, in the provision for securing the corporators against interference with the franchises granted, by the establishment of ferries or the erection of competing bridges. As these inducements were, so far as the act discloses, equally necessary to promote the erection of each of the bridges, there is no reason, *a priori*, for supposing that the Chenango bridge was not as fully within the intention of the legislature in offering them as either of the other three bridges. We are to look also into the system upon which the several detailed provisions are framed and adjusted to the two corporations, and the scheme was this : to provide in the outset for the formation of one of the corporations (the Delaware Company being chosen), and to attach primarily to that one all the provisions and regulations which it was thought expedient to enact respecting both companies, and then to provide for the incorporation of the other company, and to adopt these provisions and regulations to that corporation by

brief words of reference.   The act is obviously drawn in
conformity to this system.   Among the special provisions,
which are numerous and are set down in great minuteness
of detail, employing some fifteen sections, is that one
which declares that it shall not be lawful· for any person
to erect any bridge or establish any ferry *across the said
west and east branches of the Delaware river*, within two miles
either above or below the bridges to be erected and main-
tained in pursuance of the ·act.   The Delaware Bridge
Company being thus fully constituted, the Susquehannah
Company is then provided for in a single section.   The
location of the two bridges to be constructed by that com-
pany is fixed and the name of the corporation is stated;
and the section then proceeds to declare that the said
Susquehannah Bridge Company, and their successors and
assigns shall and may have perpetual succession, and
shall be and hereby are invested with all and singular the
powers, rights, privileges, immunities and advantages, and
shall be subject to all the duties, regulations, restraints
and penalties which are contained in the foregoing incor-
poration of the Delaware Bridge Company, and it declares
that all and singular the provisions, sections and clauses
thereof, not· inconsistent with the particular provisions
herein contained, shall be and hereby are fully extended
to the president and directors of this incorporation.   The
section then provides for commissioners to open the books
of subscription to the stock, and for the rate of tolls,
which are to be the same for the bridge over the Chenango
river, as are provided respecting one of the bridges of the
Delaware company, and for the bridge over the Susque-
hannah, one-third more; and this is all which is said respect-
ing this company.   The intention of giving to the two
companies precisely the same faculties, and of making
them, as far as possible, exactly similar, in all respects, is
very apparent.   The draftsman was assiduous in bringing
together·a great many words to express that intention, and

was apparently fearful that some ingenious criticiser would find grounds to distinguish between them contrary to what he intended. Now as these charters were designed to continue for thirty years, and could not be expected to be immediately profitable, the provision forbidding competition must have been regarded as of great importance. The adventurers must necessarily look to the future for their reimbursement for the outlay which they must immediately incur, but in order to rely upon that resource, they, we may suppose, required a guaranty against other competitors for the profits of the transit across the river, which the increase of population, and the opening of the country to settlements were expected to bring. Such a guaranty was inserted in very explicit language, in the provisions respecting the bridges spanning the Delaware. If that guaranty is not also applied to the bridges of the other company, it was undoubtedly owing to an accidental omission, the motives for attaching it to *these bridges being equally cogent* as in the case of those crossing the Delaware, and the general intention to give each of the companies a charter exactly similar being, as has been mentioned, abundantly apparent. With this general outline of the statutes, we are prepared to examine the particular words of reference by which the restraint in question is supposed to be engrafted upon the charter of the Susquehannah Bridge Company. That company is invested with all the *rights, privileges, immunities and advantages of the Delaware company.* If the language of the provision respecting that company had been that no person should erect a bridge or establish a ferry within two miles either up stream or down stream from the bridges erected by them, this power of excluding competition would have been a right and a privilege, and moreover an immunity and an advantage, which, beyond all question, would have been annexed to the Susquehannah company equally with the Delaware company. But the prohibition is, in terms,

against erecting a bridge across either of the branches of the Delaware river within the prescribed distance; and it is *because the streams of water are named,* that it is argued that the prohibition cannot be applied by the words of reference which are used to the bridges over the other streams. It is very true that a provision incorporated into the Susquehannah charter, that bridges should not be erected over the Delaware river would be idle and absurd. But I am of opinion that the construction contended for by the defendants would be too narrow and literal. It was, I think, the substance of the provisions in the first mentioned charter, as distinguished from the verbal phraseology, which was to be imported by means of the words of reference, into the other. Reasonable consideration should be given to the theory on which the act was framed. The form adopted was resorted to in order to avoid tedious repetition, but great care was taken that no provision relating to the former company should be left out in the other. This is obvious from the further language of the section, as all the rights, privileges, &c., of the Delaware company were conferred upon the other, the latter, was also charged, as was manifestly just, with all the duties, restraints and penalties which had been enacted respecting the first named company; and for abundant, if not by excessive caution, it was added that all the provisions, sections and clauses of the Delaware charter, not inconsistent with the particular provisions contained in the act should be "fully extended" to the Susquehannah company. The substance of the provision against competition was not at all inconsistent with anything contained in the act, but was perfectly homogeneous with the scope and intention. A literal construction which should shut out from the Susquehannah charter all the provisions primarily annexed to the incorporation of the Delaware company, which could not be transplanted in *haec verba* into the other would quite subvert the intentions of the

legislature. The act gives, in quotation marks, the form of the subscription paper to the stock; and the promise contained in it is " to pay the sums subscribed to the president and directors of the Delaware Bridge Company." It would of course be absurd to use such a paper for obtaining subscriptions to the stock of the Susquehannah company. Then the provision for inspection requires the official action of the judges of the court of common pleas of the county of Delaware; and yet it is preposterous to suppose that they were to go out of their own county to inspect the bridges at Chenango point while there were judges of the same grade in the proper county. So in regard to the directions for publishing notices of the meeting of the stockholders to choose directors. They are adjusted to the locality of the Delaware bridges, and would have to be accommodated to the other locality, or they could not be used.

It is argued by the defendants' counsel that settled rules of interpretation forbid a liberal construction of statutes of the character of that under consideration. If by such a construction is meant the giving a statute a scope beyond the language, for the purpose of embracing cases of a similar character with those provided for in terms, by means of what is called an equitable construction, I admit that such an interpretation cannot be given to a statute like this one which does, upon the plaintiffs, prohibit what would otherwise be a matter of right. It is no doubt of the class of enactments which the courts ought not to interpret in equity as is shown by the cases to which the defendants' counsel have referred. The most permanent one is *The Stonebridge Canal Company* agt. *Wheeley* (2 *Barn. & Adol.*, 792). The proprietors of a canal constructed pursuant to an act of parliament, were authorized to exact certain tolls upon every ton of goods in boats navigated on any part of the canal, *and which should pass through one or more of the locks.* A portion of the

canal was capable of being navigated without the necessity of passing through any of the locks, but it was held that toll could not be exacted unless there was an actual passage through a lock. The case was not within the letter, though it was, perhaps, within the equity of the acts, but in such a case an equitable construction was not admissible. In the present case I think the prohibition respecting other bridges is imported into the Susquehannah corporation by the very words used by the legislature. They are broad enough to embrace the substance and real meaning of the provision. The only question is one of intention, and I have already stated my reasons for thinking that there was a plain design on the part of the legislature that the two corporations should be precisely alike in this, as well as in all other particulars, except the different points at which the bridges were to be erected.

But it is argued on behalf of the defendants that the prohibition against the erection of other bridges, even if it is incorporated into the Susquehannah charter, does not disable the legislature from passing a law authorizing other bridges to be erected, but that it is only a restraint upon unauthorized individuals. In determining this point, we must keep in mind that the provision against competing bridges is one of the terms of a contract between the corporators and the state. That the legislature acting in behalf of, and fully representing the state, and being the law-making power of the state, was virtually the party bound by the prohibition, and that the object of inserting it in the act was to secure to the adventurers a more certain provision for the reimbursement of the moneys which they would have to expend in constructing the bridges. If the legislature was competent to license another association of adventurers to build competing bridges at a considerable distance of time, but within the continuance of the charter, they could do so at any earlier period, or as soon as the first bridges were constructed; and if they

could license others by granting to them an act of incorporation *a fortiori* they could erect *a free state bridge*, and thus remove all obstructions to the passage of the river otherwise than upon the plaintiffs' bridge. I think such a construction would do great violence to the meaning of the contract. The legislature must be understood to have offered to the parties proposing to erect the bridge that they should receive a toll at the rates mentioned in the act, and that they should not be subject to be interfered with or diminished by competing bridges erected within the prescribed distance. Such is the *substance* of the undertaking on the part of the public. If the legislature was left free to construct bridges themselves, or to license others to do so, the provision would be wholly illusory. We can have no idea of a contract where one of the parties only is bound, or of a contract annexed to a grant which may be renounced by one of the parties as soon as it was made.

The position of the defendants' counsel does, at first view, appear to derive some support from the case of *Thompson* agt. *The New York & Harlem Railroad Company* (3 *Sand. Ch. R.* 625, 659). In that case the plaintiffs' toll bridge across the Harlem river was erected pursuant to an act of the legislature which contained a prohibition, in terms, very similar to that which we are considering; and the violation of their rights of which the plaintiffs complained was the passing of the Harlem railroad across the river by means of a bridge. The learned Vice-Chancellor (SANDFORD) declared that this was not such an interference as was contemplated by the prohibitory provision, a railroad bridge being, as he conceived, incapable of being used for the passage of any vehicle, animal, or foot passenger, for whose passage the proprietors of the chartered bridge were entitled to receive toll. He added, in effect, that if the progressive spirit of the age had developed and matured a mode of conveying passengers and

freights from place to place, across rivers and over morasses [?] which was unknown when the act chartering the plaintiffs' bridge was enacted, that there could be no doubt that the legislature, in the exercise of its sovereign duty to provide ways for the use of the people, might authorize the construction and use of such new invention, although the necessary consequence might be that the former mode of conveyance would be superseded, and that those who were profitably engaged in their pursuits would be subjected to the loss of their business and capital. I entirely concur in this view, and consider it quite sufficient for the decision in that case in favor of the defendant. The same point had been decided the same way by Chancellor WALWORTH in *The Mohawk Bridge Company* agt. *The Utica & Schenectady Railroad Co.* (6 *Paige*, 554). But the vice-chancellor in the Harlem railroad case, in addition to the satisfactory ground for his judgment which I have mentioned, remarked that the act chartering the plaintiffs' bridge did not declare that the legislature might not *permit* another bridge to be erected. Indeed, he added, the declaration inserted in the second section (the prohibitory clause) was evidently aimed at the rights which it was supposed the inhabitants of Morrisania and Harlem might claim under their old patent, rather than by [?] any interference by others with the franchise granted to the bridge company. As to all persons other than the inhabitants of Morrisania and Harlem such a provision was wholly unnecessary, because no one could set up a toll bridge or ferry without authority from the state. In the present case the prohibitory declaration was intended, beyond all doubt, to prevent the interference of other persons with the company's franchise, and if the facts in the Harlem case proved, as the learned vice-chancellor stated, that other motives and other objects were aimed at by the corresponding provision in that case, it would be no precedent for the present one, if there had not been another objec-

tion upon which the decision might turn, and if the case were esteemed a binding authority.

To state my conclusion on this part of the case in a few words : The state, through the law-making power, contracted with the bridge company that if it would build and maintain the bridges in question, the law would not permit any other person to put up a bridge over the stream within two miles either way from such bridges. The chartering of another company with authority to construct a bridge within that distance was a plain violation of the bargain, and as it was a contract within the protection of the constitution of the United States, the second charter was null and void.

The act of 1808 (*ch.* 119) divides the Susquehannah company into two companies, one of which was to retain the name of the Susquehannah Bridge Company, and to be limited to erecting and maintaining the bridge across the Susquehannah river under all the provisions of the charter given to that company by the act of 1805, except the limitation of its duration for thirty years (which limitation was expressly repealed); and by the next section of the act, the other company, which is the plaintiff in this suit, was to be called "The Chenango Bridge Company," and to have for its object the erecting and maintaining the bridge now in question over the Chenango river, and it was to be a corporation with perpetual succession "under all the provisions, regulations, restricting clauses and provisions of the before-mentioned Susquehannah Bridge Company." There is no difficulty of the character of that supposed to exist in the former case, in giving full effect to this mode of reference. After giving the Susquehannah Bridge Company an unlimited charter and all the faculties and incidents which it had under the act of 1805, it incorporates the Chenango company and endows it with the same precise rights, faculties and incidents.

Under this act the plaintiffs' bridge was built, and they

claim for it the rights intended to be secured to them by the legislative provisions enacted in its favor. I think we are obliged by the law to protect them in the enjoyment of those rights.

It is probably true that the condition of the country has so far changed that the public convenience requires further accommodation for crossing the river at this point than plaintiffs' bridge affords. This may show that the legislative acts which we have been examining were improvidently passed. But the men of that day thought otherwise. Whether the present state of material progress in that section of country has been accelerated to any extent, or if it has, to what extent, by the expenditures of the plaintiffs' corporation, it is impossible to say, nor can we determine whether less encouragement than was given would have accomplished equal results. We are only concerned to determine accurately what the precise terms of the legislative contract are and to give them effect. The circumstances of this case may lead to doubt in some minds whether the series of adjudications which has attributed to legislative acts, of this character, the force of contracts, within the constitutional provision, was upon the whole wise and legally sound. Cases may certainly be presented, if this is not one, where we may think that the private interest of the corporators ought to be forced to give way to the public good. But after a uniform course of decision of the court of last resort upon such questions, upon this precise point, extending over more than half a century, a court possessing only a subordinate jurisdiction upon this class of subjects can not be expected at this day to depart from the old and strike out a new path.

It is not for us to determine in this action whether the franchise possessed by the plaintiffs is subject to the exercise of the right of eminent domain residing in the government of the state. For myself I cannot see how proprie-

tary rights acquired under such a contract should be more sacred than other property which a citizen or a corporation may possess, and such I understand to have been the judgment of the courts where the question has arisen. (*West River Bridge* agt. *Dix*, 6 *How.* 507; *Richmond, &c. Railroad* agt. *Louisa Railroad*, 13 *id.* 83; *Boston, &c. Railroad Company* agt. *Salem Railroad Company*, 2 *Gray.* 1). But it will be time enough to consider this question when it shall arise.

The result of these views is that the judgment appealed from should be reversed and judgment entered for a perpetual injunction against the maintenance of the defendants' bridge across the Chenango river.

EMOTT, J. (*dissenting*). That the Chenango Bridge Co., which was created by act of the legislature passed April 1st, 1808, became vested with all the rights and privileges which had been previously conferred upon the Susquehannah Bridge Company by the 30th section of the act of April 6th, 1805, is sufficiently plain to need but little argument or remark. By the act of 1805 the Susquehannah Bridge Company was incorporated for the purpose of building a bridge over the Susquehannah river near what was then known as Oquago in the county of Tioga, and also another bridge across the Chenango river at Chenango Point, where the village of Binghamton has since grown up. The act of 1808 divided as it were the corporation into two. Its original capital was $20,000, and it was authorized, as I have mentioned, to erect and maintain two bridges, one over each of the rivers specified. It was now restricted under its original name and corporation to the building and maintaining one of the bridges which were included within the original design, that over the Susquehannah river, and its capital was reduced to $10,000, one-half of the original amount. At the same time its stockholders, with any others who might associate with

them, were created a new body corporate under the name
of the Chenango Bridge Company, with the power and
right exclusive of the parent organization to build and
maintain the Chenango bridge.    The remaining $10,000,
or one-half of the capital originally authorized, was set
apart and designated as the capital of the new corpora-
tion, and the corporation was declared to exist under all
the provisions, regulations, restrictions, clauses and pro-
visions, of the Susquehannah Bridge Company's charter.
The obvious meaning and the effect of this was to create a
new corporation with all the powers, duties and liabilities
which attached to that from which it sprang, at the time
of its creation, subject only to such modifications or inter-
pretations of those powers as would be incident to the
distinct object of the new company.    It is contended that
this did not confer upon the appellants the powers and
privileges which were given to the Susquehannah company
by the act of 1808 itself, but only such as belonged to the
latter by its original charter, and before the passage of
the act which divided the original company into two cor-
porations.    But this would be a narrow and an unreasonable
construction of the act.    The legislature incorporated the
Susquehannah company anew in 1808, changing materially
not only the object but the conditions and character of
its existence, and it at the same time chartered the Che-
nango Bridge Company for a purpose which had been in-
cluded within the design of the original charter of the
Susquehannah Company, but was now excluded from its
powers.    It would not be contended that *both* companies
were authorized to bridge the Chenango river, or that the
new company had any right to bridge the Susquehannah.
The act of 1808 in conferring upon the Chenango com-
pany the same rights as were possessed by the before
mentioned Susquehannah Bridge Company, referred to the
amended corporation which was the creation or result of
the amendment made in the original charter of that com-

pany by the act itself.  It is the Susquehannah Bridge Company then and there created and referred to in the act itself whose powers and privileges are conferred *mutatus mutandis* upon the Chenango Bridge Company.  It does not, therefore, admit of any doubt to my mind that the Chenango Bridge Company has perpetual succession without the limitation of 30 years, which was originally imposed upon the parent company, but was removed by the act of 1808, and that the Chenango bridge might be built at any time within four years from the passage of this act instead of being required to be completed by the 1st of December, 1809, which was required of the Delaware bridges, and as it is contended if not conceded of the Susquehannah bridge in like manner by the act of 1805.

As the next step in the present discussion we must go back and examine the effect of the two statutes of 1805 and 1808 upon the Susquehannah Bridge Company, and especially the construction of the 38th section of the former statute in reference to the privileges of that corporation.  The act of 1805 incorporated the Delaware Bridge Company with specific and enumerated powers, privileges and restrictions, and with all necessary regulations for its corporate existence and management.  Then the 38th section of the act created the Susquehannah Bridge Company, and invested it with "all and singular the powers, rights, privileges, immunities and advantages, and declared that it shall be subject to all the duties, regulations, restraints and penalties which are contained in the foregoing incorporation of the Delaware Bridge Company, and adds that all and singular the provisions, sections and clauses thereof, not inconsistent with the particular provisions herein contained, shall be and hereby are fully extended to the president and directors of this incorporation.  This single section of the act is the entire charter of the Susquehanna company, and it contains nothing beside the provisions which I have quoted, except a designa-

tion of commissioners to receive subscriptions to the stock, and regulations as to the toll on each of the bridges which the company were originally authorized to build, that is, the Susquehannah and the Chenango bridges respectively. It is very plain that the charter of the Susquehannah Bridge Company was the law incorporating the Delaware Bridge Company applied to the first named corporation, and modified if necessary to adapt it to its circumstances and design. The language conferring upon the one the powers and duties of the other is as full and comprehensive, and as distinct as can be imagined, and it is given in the place of any enumeration of powers or duties in respect to the Susquehannah company specially. Whatever, therefore, and all which is contained in the act incorporating the Delaware Bridge Company, which is not inconsistent with or inapplicable to the Susquehannah company is as much a part of the charter of the latter as if it had been expressly enacted in reference to it. One or two considerations growing out of the act of 1808, will make this still plainer if it were necessary. The act of 1808 while it continued the Susquehannah company in existence as a corporation, not only limited its powers and purposes to bridging the Susquehannah river only, but removed the limitation of its existence to 30 years, and gave it perpetual succession. This is an express provision of the act. But the limitation is found not in the 38th section of the act of 1805, which expressly relates to the Susquehannah company, but in that portion of the act relating to the Delaware company, and is made a part of the charter of the Susquehannah company solely by the language which I have quoted which inserts into the charter of the one, this provision contained in that of the other. So also the Delaware company were bound to erect their bridges within a certain time. This also was considered by the legislature to have become a part of the organic law of the Susquehannah company, since the act of 1808 expressly

released the latter from this obligation also, and extended the time within which their bridge was to be constructed. It should be observed also with reference to this latter provision that in the original charter of the Delaware company it is coupled with or immediately followed by a provision that upon the completion of their bridge in the manner and within the time specified it should be inspected by the judges of the court of common pleas of Delaware county, and upon their certifying to the company's compliance with the act, and not otherwise nor before, toll might be taken. So far as this conferred powers or duties upon the judge of Delaware county it was not applicable to the Susquehannah or Chenango bridges, which were in other counties, and yet the requirements of the act as to the time and mode of erection of the structures have been conceded on all hands to apply as well to the latter as to their prototypes.

The main question in this part of the case, and that upon which the supreme court decided the controversy against the plaintiffs, is the question whether the first clause of the 31st section of the act of 1805 being a part of that act relating to the Delaware Bridge Company is made applicable to and a part of the charter of the Susquehannah company by the words of the 38th section already quoted. The 31st section enacts "that it shall not be lawful for any person or persons to erect any bridge or establish any ferry across the said west and east branches of the Delaware river within two miles either above or below the bridges to be erected and maintained in pursuance of this act, except between the times the said bridges or either of them shall not be passable, or forcibly to pass the said bridges or either of them without having previously paid to the toll gatherers for the use of said corporation, the toll hereby established for crossing said bridges. The section proceeds to give a penalty and an action to recover it for passing the bridges

without paying toll, and it adds a proviso that any person may cross the river within the forbidden limits to or from his own land, in his own craft, without toll. The effect of this provision as to the Delaware company is to confer upon them the privilege of excluding all other persons or corporations from bridging or ferrying for hire across the rivers which they proposed to bridge for a distance of two miles on each side of their bridges. It is as if the legislature had said to the Delaware company, we authorize you to build two bridges over certain rivers, and we give you the privilege of excluding all other bridges or ferries for two miles on each side of each of your bridges. Whether this was merely a privilege to last *until* the legislature removed the bar or exclusion, or operated as a grant and a contract against subsequent invasion of their privileges even by legislation will be hereafter considered. Assuming at present for this argument that it was the latter, and it was manifestly no unimportant part of the privileges, immunities and advantages of the Delaware company. The power to exclude competition within certain limits was hardly less valuable to them than the power to compel the payment of tolls by the exaction and enforcement of a penalty. It will not be denied that the 38th section of the act makes the latter clause or provision applicable to the Susquehannah company, or that they could by virtue of it prosecute and recover a penalty for crossing their bridge or bridges without paying the toll. After careful consideration I am unable to see why the right to exclude all other bridges for a certain distance is not in like manner conferred upon the Susquehannah company. It is true that the words of a grant of privilege to a corporation in derogation of the rights or interests of the public must be strictly construed, and nothing passes but what is explicitly granted. (*See* 1 *Black, U. S. R.* 446). But this is a rule which has but a remote application here, or certainly is not decisive of the present dispute. We are to

determine this question by our apprehension of the intention of the legislature, and the meaning of their words used in the act of 1805. If their language by a natural and obvious construction imports the grant of this exclusive privilege, it is but a slight argument against such a construction of it, that it appears after the lapse of *fifty* years that such a grant *is now* opposed to public convenience. No such public convenience was affected by the grant when it was made, nor can we presume that the legislature foresaw or supposed that it ever would be. The growth and development of this beautiful and flourishing region of the state, which is now a part of our history as well as matter of observation, was then hardly imagined by any one. The necessity which the legislature saw and the object which they evidently sought to accomplish was to secure the construction of one bridge and not to provide against an interference with a demand by the public convenience for more. It can hardly be supposed that the possibility of such a demand was within their contemplation at all. The argument, however, must proceed here upon the intention of the legislature at the time, and the actual consequences of their action at a remote period while they may prove that the legislation in question was unwise, can hardly show what that legislation really was or was intended to be. It is undisputed that the clause in question is a part of the privileges of the Delaware Bridge Company. It is expressly declared by the legislature that the same privileges which they obtain shall belong to their associate company, so far as they are applicable. The question then is whether this privilege of the Delaware Bridge Company is consistent with the nature and circumstances of the Susquehannah company, and applicable to the bridges of the latter. It was argued that it was not applicable to the present plaintiffs, the Chenango company, because the Chenango river is a single stream, while the act is applicable and refers to the two branches of the

Delaware. But the question really is whether the privilege was conferred upon the Susquehannah company the parent of the plaintiffs, and the circumstances of this company nearly resemble those of the Delaware. Like the latter company, the Susquehannah Bridge Company was incorporated to bridge two streams. The Delaware company was to bridge the east fork and the west fork of the Delaware, two distinct structures widely distant, and the other company was in like manner to bridge the Susquehannah and the Chenango. If there would be any force in the argument applied to a direct succession of the Chenango Bridge Company to the privileges of the Delaware company, because the act conferring these privileges upon the latter refers to two streams and their bridge, while there is but one over the Chenango, the argument loses all its force, by reason of the fact that the title of the latter corporation is derived through the Susquehannah company, which resembled the Delaware company, exactly in the point under consideration. Nor do I find any difficulty in the fact that the Chenango river terminates its separate existence by a junction with the Susquehannah less than two miles below the plaintiffs' bridge. Whether the restriction against other bridges for two miles across the river bridged by the plaintiffs, will extend to and include the greater stream into which it is merged within that distance, or whether it only extends to the mouth of the Chenango, is a question which we need not answer at present. If the restriction in question is applicable to the plaintiffs and to the river which their bridge crosses, it will extend up and down that stream two miles so far as its existence will be recognized, and it is not inconsistent with the existence or applicability of such a privilege for the specified distance in one direction, that the river does not run or is not recognized for a similar distance from the plaintiffs' bridge in the other. It is not material to the present question if the plaintiffs' bridge is so near the

mouth of the river that there cannot be two miles of the course of the river below included within the grant. The defendants' bridge is above the plaintiffs' and I see no reason why the plaintiffs should not have the benefit of an exclusive privilege by virtue of such a clause as this for two miles above their structure, although the situation of the latter was such that a similar privilege could only include a short distance, or even nothing at all below. I am unable to concur in the opinion expressed in the supreme court upon this part of the case. As I read these acts the effect of them is that the legislature say that it shall not be lawful for any person or persons to erect any bridge or establish any ferry across the Chenango river within two miles above or below the plaintiffs' bridge. This is the language of the act, and having arrived at the conclusion that it is applicable to the plaintiffs, the next question is upon its effect.

The legislature reserved no power to alter, amend or repeal these acts or any portion of the privileges conferred upon the companies. The plaintiffs contend that this clause of the statute of 1805 is a contract by the state that they will grant no liberty or authority to any person to bridge or ferry across their waters within the specified limits, and that the subsequent incorporation of the defendants to bridge the Chenango river less than two miles above the plaintiffs' bridge is a violation of the contract, and is therefore void under the provision of the constitution of the United States forbidding the states to pass laws which impair the obligations of contracts.

That the legislature of a state may bind the state by a contract, and that such contract is within the protection of the constitution of the United States, so that the act containing it cannot be repealed, nor the rights conferred or obligations assumed by it, impaired by subsequent legislation, are doctrines long established both in the federal and state jurisprudence. (*Providence Bk.* agt. *Bil-*

*lings*, 4 *Peters*, 561; *Charles River Bridge* agt. *Warren Bridge*, 11 *Pet.* 420; *Richmond Railroad* agt. *Louisa Railroad*, 13 *How.* 71; *Boston & Lowell Railroad* agt. *Salem & Lowell Railroad*, 2 *Gray*, 1).

A state may even limit or measurably part with its taxing power, one of the highest attributes of sovereignty, and that by a clause in the charter of a corporation, and such a charter is a contract from which future legislatures cannot depart, nor tax the corporation otherwise than according to its provisions. (*State Bk. of Ohio* agt. *Knoop*, 16 *How.* 369; *Ohio Life & Trust Company* agt. *Debolt*, *id.* 416; *Jefferson Br. Bk.* agt. *Skelly*, 1 *Black*, *U. S. R.* 436). If in the present instance the plaintiffs' charter contained a clause to the effect that the state will not authorize nor allow any bridge or ferry within two miles of the plaintiffs' bridge, then the plaintiffs present a contract made with them by the state, and which the state could not violate nor impair by chartering the defendants. The case thus comes to a question of the meaning and effect of this clause of the statute. Upon this subject we are not furnished with any case precisely parallel. In the *Mohawk Bridge Company* agt. *The Utica & Schenectady Railroad Company* (6 *Paige*, 554), Chan. WALWORTH expressed the opinion that a prohibition against the establishment of a ferry within a certain distance of the plaintiffs' toll bridge, did not deprive future legislatures of the right to authorize the erection of another bridge within the prescribed limits whenever the public good shall appear to require it. The circumstances of that case, however, are different from the present, since the defendants there did not propose to carry passengers who merely desired to cross the river, and would otherwise employ the plaintiffs' bridge, but only travellers in their railroad cars from one part of the state to another. The railroad bridge, as the chancellor observes, was not a toll bridge within the meaning of the grant to the Mohawk Bridge Company. In the case of

*Thompson* agt. *The New York & Harlem Railroad,* (3 *Sand,
Ch. R.* 625), Vice-Chancellor SANDFORD construed a clause
perhaps still more closely resembling that in question here,
as not restricting the power of the legislature to permit
the construction of other bridges, but only the right of in-
dividuals without such permission or authority. But in
this case also, the bridge whose erection was complained
of was a railroad bridge for the transportation of passen-
gers in railroad cars, and not for the ordinary purposes of
a bridge, or of a character to compete with the plaintiffs.
The doctrine of the *Charles River Bridge case* (11 *Pet.* 420)
is that no contract that other bridges or ferries across the
same waters shall not be erected or authorized, is to be
implied from the mere grant to a corporation of the right
to erect and maintain a bridge and take tolls for using it.
In the opinion in that case, the statement of Lord TEN-
TERDEN in the case of *The Stonebridge Canal* agt. *Wheely*
(2 *B. & A.* 793), is quoted with approval, that such an act
of incorporation is a contract between the public and a
company of adventurers, and that any ambiguity must
operate in favor of the public, and the grant be construed
strictly against the company.

In the recent case of *The State Bk. of Ohio* agt. *Knoop*
(16 *How.* 388), however, the authorities are adverted to.
Judge McLEAN, and his reasoning and the judgment of
the supreme court of the United States in that case shows
that the extent of the rule to be derived from these deci-
sions is, that a right set up under such a grant must clearly
appear and is not to be presumed. The rule is undoubt-
edly to be found in these and other cases that in a grant
of privileges or franchises by a state, as in a royal grant,
nothing passes by mere implication. Yet the construc-
tion of the express words of such a grant must be reason-
ble and sensible, and its objects are not to be defeated by
a narrow and literal interpretation of words fairly suscep-
tible of an enlarged sense.

The 31st section of the act of 1805 confers upon the corporation or corporations to which it applies, two distinct privileges, one that it should not be lawful for any person to have any other bridge or ferry within a certain distance of those authorized by the act, and the other that it should not be lawful for any person to pass the bridges of the corporation without paying toll. These privileges are given in the same terms and in immediate succession. The act declares in precisely the same phrase, that it shall not be lawful for any persons to erect any bridge within the prescribed limits, or to cross the bridge to be built by the company without paying toll. Both these grants must receive a similar construction.

If the interpretation applied by the defendants to that part of the section forbidding the establishment of another bridge or ferry be correct, the residue which confers upon the plaintiff the right and the power to exact tolls for the use of their bridge must be constructed in a similar manner. If the legislature are not forbidden by the clause now in question from authorizing the construction of another bridge within the limit of two miles, they are equally at liberty to authorize any person to pass the plaintiffs' bridge without the payment of tolls. This would leave the most vital and valuable part of the plaintiffs' franchise, notwithstanding the irrepealability of the statute conferring it, wholly at the mercy of subsequent legislatures. It is a consequence which would hardly be contended for by any lawyer, and yet it is difficult to see how it could be escaped, if the principles of construction for which the defendants contend are to be adopted.

The bridges or ferries which this section is designed to prohibit within two miles of the plaintiffs' bridge are evidently such bridges and ferries as are highways or open to the use of the public, either free of charge or under the payment of tolls. Private bridges, or other means of crossing the stream for the convenience of individuals ad-

joining it, are not within the mischief against which the act aims to protect the corporation, and the section contains a proviso expressly excepting them.

But a bridge or a ferry for general and public use, whether as a common highway or upon payment of tolls, could not be erected or maintained by individuals without authority of law. The first would require at least the action of the public authorities under the existing laws to open or to accept it, and the latter could not be established at all without the intervention of the legislature to create and confer the franchise of taking tolls and maintaining the bridge or the ferry. If the section of the statute which we are considering forbids nothing but the establishment of a ferry or a bridge without authority of law by private individuals, it was unnecessary, since the existing laws were adequate to protect the company against any such acts and against any invasion of their privileges not directly authorized by legislative authority. Besides, if the erection of a bridge by authority subsequently expressly given by the legislature is not forbidden by such a clause, why should the subsequent erection of a bridge by individuals, under the authority of general laws already existing, be held within its scope? If the clause does not extend to the action of the legislature, it seems to me to forbid nothing but unlawful acts; and this, as I have observed, was unnecessary, if not nugatory.

It is true that when the legislature in an ordinary statute declares that a particular act is not or shall not be lawful, it simply declares a fact, and a fact which it is at any time competent to alter, by establishing a different rule of law in the particulars referred to. But this statute is more than a mere law, it is a contract with the plaintiffs, and the provision that the erection of another bridge shall not be lawful, is one of its terms. It would be a narrow and unreasonable construction of a contract by a private individual that a certain thing should not be done,

to hold that its meaning was that it should not be done until *he chose to permit it.*

The thing stipulated against by this statute is something which the legislature alone can do or authorize to be done, and it is as narrow and but little more reasonable a construction of their language, declaring that it shall be unlawful, to regard it as meaning that it shall not be lawful until they chose to authorize it. The question is not one of implication, but of construction, and while nothing is to be implied, yet such a statute is to be construed fairly and with reference to its purpose and effect. It seems clear to me that where the legislature agree that an act shall not be lawful or be done, they agree that they *will not do it*, or make it lawful or permissible for others to do it. I read this statute, therefore, as the judges of the supreme court did, as forbidding the legislature from conferring the privilege of maintaining a bridge or a ferry within two miles of the bridge or bridges to which this provision applies. I differ with them in considering that the plaintiffs are entitled to the benefit of the provision in question, and that it forms a part of their charter and is applicable to their bridge.

The argument from *inconvenience cannot be listened* to by a court. If the legislature have conferred such privileges as these upon the plaintiffs, it is no answer to them to say that it was unwise, inconsistent with sound policy, or indicative of a want of foresight to do so. These are considerations for the legislature, and not for us. But there is an answer to this argument. If the possession of this exclusive franchise, or of the monopoly of the travel across this river is prejudicial to the public interests—if those interests demand the opening of other avenues, or the removal of all tolls or restrictions to the passage to and from the two portions of the village of Binghamton, which are separated by the Chenango, the remedy is an easy and obvious one. The state possesses the power, by

an exercise of its eminent domain, to confiscate to public use both the bridge and the franchise of the plaintiffs. (*West River Bridge Company*, 6 *How. U. S. R.* 507 ; 13 *How.* 83.) If the public necessities require, these can both be taken away, and the bridge opened to public use, *upon due compensation* to their owners. This of course would not accomplish the objects of the defendants, since in destroying the profits of the plaintiffs, by opening their bridge to public use without toll, it would of course equally destroy the value of the defendants' bridge as a source of income. But so far as the public are concerned, and it is their interests alone which, in this aspect of the case, we are to regard, their necessities would be provided for. When the first bridge should become free and open to public use, of course all restriction upon the erection or maintenance of others would be removed, with the removal of their object and of any interest in any person to supplant them. The monopoly may thus be terminated and the means of transit multiplied to any extent, while the rights guarantied by the legislature to the plaintiffs would be protected, and compensation awarded them for those rights when the public good demanded their extinction.

I am of opinion that the judgment of the supreme court in this case should be reversed and judgment given for the plaintiffs.